Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BRADY E., LIBERTY E., and C.E., <br><br> Plaintiffs, <br><br> vs. <br><br> STRYKER CORPORATION, and STRYKER UNITEDHEALTHCARE CHOICE PLUS, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 1:21-cv-00041-HCN <br><br> Judge Howard C. Nielson |

**COME NOW** Brady E., Liberty E., and C.E. collectively, individually and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiffs Brady E. ("Brady"), and Liberty E. ("Liberty") are natural persons residing in San Jose, California. They are covered by UnitedHealthCare Choice Plus ("the Plan") provided through Brady's employer, Stryker Corporation.

2. Plaintiff C.E. ("C.E.") is a resident of San Jose, California. As a beneficiary of his father's health insurance plan, he received treatment at Elevations Seven Stars ("Elevations"), a

1

licensed residential treatment facility in Syracuse, Utah, from May 6, 2019, through October 16, 2019.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the Defendants do business in the State of Utah, the treatment in question was rendered in Syracuse, Utah and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of C.E.'s denied claims from May 30, 2019, through October 16, 2019, pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

6. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

7. In the first grade, C.E. lost interest in interacting with other students, seemed overwhelmed and refused to attend after-school activities. C.E.'s parents were concerned with this and they chose to have him observed by a psychotherapist, which noted that C.E. did not know how to give himself breaks while doing schoolwork like other students did.

8. From kindergarten through fourth grade, C.E. had an unusually large number of absences from school due to upper respiratory infections and increasing school refusal.

9. By the beginning of fifth grade, C.E.'s tics began to interfere with daily activities like walking.

10. C.E. participated in a sleep study which revealed significant sleep apnea. C.E. underwent sruery to remove his tonsils, adenoids, turbinates and to restructure his airway, which did not ultimately alleviate his sleep apnea symptoms.

11. By this time, C.E. was only attending half days at school, calling Liberty to come to the school either to pick him up or help manage his anxiety.

12. C.E.'s doctor switched him to Prozac because Zoloft was not helping enough with depression and anxiety. At this same time, C.E. was participating in talk thery on a weekly basis unless he was unable to do so due to panic attacks.

13. In sixth grade, C.E.'s anxiety became even more of a problem. Simutaneously, C.E. was suffering from ear infections and was put on a antibiotic called Augmentin XR. C.E.'s doctor also switched his medication again from Prozac to Cymbalta. In addition, C.E.'s doctor gave him a low dose of Ativan to use as needed in order to help him get to school; however the Ativan did not help calm him.

14. C.E. suffered from substantial panic attacks that left him unable to breathe. Futher complication matters, C.E. had a reaction to the Augmentin XR the gave him hallucinations. After a consulation with C.E.'s doctor, it was decided to take him off Cymbalta since they could not determine what part that might have played in the reaction.

15. C.E.'s panic attacks became more aggressive at home whenever his parents tried to intervene physically to calm or contain him. C.E. was unable to do schoolwork and when he did complete his homework he was unable to find things in his backpack that he had packed that same morning.

16. C.E.'s doctor recommended that he be put on Home and Hospital Intsruction Porgram through the school district, and then was prescribed Abilify as a mood stabilizer. This seemed to help but caused a major increase in appetite and weight gain.

17. When school refusal became the normal for C.E., his parents decided to pull him from Ida Price and enroll him at Ocean Grove Charter School, a pubic homeschool charter.

18. C.E.'s doctor suggested his parents take him to see Glen Elliott, MD, PhD, at The Children's Health Center in San Francisco, California to ascertain whether they were missing something is his diagnosis.

19. Dr. Elliot observed the C.E. had anxiety, panic disorder, depression bordering on major depressive disorder, and noted some features of autism. Dr. Elliot recommended yet another medication change. After this assessment, C.E. saw an ew psychiastrist who started him on several new medications including Buspar, Lamictal, Geodon and Concerta, none of which seemed to make any significant difference.

20. C.E. enrolled in the Boy Scouts program, but was unable to stay due to becoming more isolated. C.E.'s new psychiastrist ordered a Genetic Assay test to try to determine what drugs might be most likely to help. C.E. was then prescribed Deplin, which helped with the low energy he had been experiencing.

21. By the end of middle school, C.E. had tried numerous medication combinations, school settings, curriculum approaches, doctors, specialists, counselors and parenting approaches. Despite these efforts, C.E. had become increasingly isolated, anxious, depressed and occasionally he was violent, but only to family members.

22. In 2016, C.E. was enrolled in Fusion Academy ("Fusion"), a private school specializing in one-on-one instruction. In December of 2016, C.E. met with a pediatric neurologist

specializing in movement disorders. C.E. was diagnosed with Tourette's Syndrome with co-morbid anxiety, panic, depression, ADHD, and OCD. However, even with this diagnosis there was not a strategy or treatment plan given.

23. Shortly thereafter, C.E. began to refuse to attend Fusion. For his tenth grade year in the Fall of 2017, C.E.'s parents returned to a homeschool format using Fusion for support. C.E.'s parents tried working with William G. Bhader III, MSW, who consulted with them regarding their parenting approaches for managing C.E.'s challenging behaviors.

24. C.E. requested a counselor experienced in Comprehensive Behavioral Intervention for Tics ("CBIT"), which is the recommended treatment for tics. At this point, C.E.'s parents also switched psychiatrists who prescribed Haldol, which made no discernable difference. After that, C.E.'s new psychiatrist, Dr. Grey had him discontinue all antipsychotic medications. C.E. became more quiet, but most of his sypmtoms persisted. When C.E.'s parents tried a course of benzodiazepines again, they found that made C.E. more agitated.

25. C.E. was having psychogenic non-epileptic seizures and was also diagnosed with agoraphobia. After a few weeks of treatment, Dr. Grey strongly recommended that the best way for C.E. to make progress was to admit him to a residential treatment center. Per Dr. Grey's recommendation, C.E. was admitted to Elevations in May 2019.

### Pre-Litigation Appeal of the Plan's Denial of Coverage for C.E.'s Care

26. The Family first received notice of C.E.'s denied coverage of his treatment at Elevations through a letter from United Behavioral Health ("UBH"), dated June 3, 2019.

27. In this letter UBH denies treatment and stated "you have made progress and your condition does not meet guidelines for futher coverage of treatment in this Residential setting and instead recovery should be continued in the "Mental Health Partial Hospitalization Program

setting", based on Optum Level of Care Guidelines for Mental Health Residential Treatment Center Level of Care.

28. On October 7, 2019, UBH sent a letter to C.E.'s parents enclosing a copy of the relevant UBH records/critera that they used to determine the denial of coverage.

29. On November 21, 2019, C.E.'s parents submitted a Level One Appeal to United Behavioral Health (UBH) for denial of coverage for C.E.'s treatment at Elevations from May 30, 2019, through October 16, 2019.

30. "Upon receiving notice on June 3, 2019, that UBH had denied C.E.'s treatment, we discussed his need for continuing care with his treatment team at Elevations. Based on their determination it was not appropriate for him to return home."

31. On December 24, 2019, Optum sent a letter to Elevations denying coverage.

32. Specifically, Optum stated that there were no acute medical/psychiatric comorbid conditions reported that required continued mental health treatment in a 24 hour/day residential treatment setting.

33. On February 11, 2020, UBH responded to the Level One Appeal upholding their denial stating that C.E. made good progress and no longer needed the type of care provided in this setting based on UBH's Level of Care Guideline for Mental Health Residential Rehabilitation Level of Care.

34. On February 17, 2020, the E. Family submitted a Level Two Appeal, in which it was noted that UBH incorrectly process their Level One Appeal as a provider appeal.

35. The E. Family stated in this letter that on Februray 2, 2020, the E. Family's healthcare advocate, Denial Management Inc., called Optum to address this issue and UBH confirmed that the appeal would be processed correctly.

36.     On February 5, 2020, the E. Family's advocate called once again and UBH confirmed that the appeal had been sent back and escalated on February 5, 2020 and to allow 15 days for processing. However, this estimated time of arrival did not give the E. Family enough time before the due date of their appeal.

37.     On March 21, 2020, Optum sent a letter to Elevations as a response to the Level Two Appeal, stating all available appeal options have been exhausted and mentions nothing of processing the Level One Appeal incorrectly.

38.     On September 12, 2020, the E. Family submitted a letter to UBH.

39.     In this letter, it was stated the UBH never responded to their Level Two Appeal addressing that UBH process their appeal inccorectly, in which the Plan has up to 60 days to respond. The E. Family never received any communication requesting an extension of time to respond.

40.     On Septemeber 18, 2020, UBH responded to the E. Family's follow up letter.

41.     In this letter, UBH states that all available internal appeal option have been exhausted.

## CAUSES OF ACTION

(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))

42.     ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.  29 U.S.C. §1104(a)(1).

43. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

44. In addition, ERISA's underlying claims procedures provide clear guidelines for appropriate review of a denied claim including, but not limited to the requirement that individuals who provide reviews based on medical opinions have credentials and expertise equivalent to the claimant's treating physician(s) )C.F.R. §2560.503-1(h)(3)(iii).

45. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the E. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for C.E.'s claim denial, written in a manner calculated to be understood by the E. Family;  2) by failing see that C.E. was a threat to himself and others 3) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the C.E.'s claim.

## Claim for Relief for Violating the Parity Act

46. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

47. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder

benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

48. The Plan violated the Parity Act by denying provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy.

49. The actions of The Plan in failing to provide coverage for C.E.'s treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

50. The actions of The Plan has caused damage to the E. Family in the form of denial of payment of C.E.'s treatment.

51. The Plan is responsible to pay for C.E.'s treatment claim along with pre-judgment interest and attorney's fees and costs pursuant to 29 U.S.C. §1132 (g).

## **RELIEF**

WHEREFORE, Plaintiffs seeks relief as follows:

52. Judgment in the amount of C.E.'s past due treatment claims from May 30, 2019, through October 16, 2019.

53. Pre-and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

54. An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

55. For such further relief as the Court deems equitable.

RESPECTFULLY SUBMITTED this 19th day of March, 2021.

G. ERIC NIELSON & ASSOCIATES

  /s/ Laura Nielson
Laura Nielson

*Attorney for Plaintiff*